2022 IL App (1st) 201371

No. 1-20-1371

FIRST DIVISION
April 25, 2022

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | | Cook County. |
| | ) | |
| v. | ) | No. 91 CR 22152 |
| | ) | No. 91 CR 22460 |
| JEROME JOHNSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Timothy J. Joyce, |
| | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner-appellant Jerome Johnson submitted a claim to the Illinois Torture Inquiry and

Relief Commission (TIRC) under the Illinois Torture Inquiry and Relief Commission Act

(TIRC Act) (775 ILCS 40/1 *et seq.* (West 2018)), alleging that his convictions in two

underlying cases resulted from his torture by Chicago police in August 1991. The TIRC issued a disposition in which it found that Johnson's torture claims for both cases fell within the scope of the TIRC Act and that there was sufficient evidence of torture to refer the matter to the circuit court for judicial review. Following discussion of discovery matters, Johnson moved for substitution of judge as of right, which motion was denied by the circuit court (Hon. Timothy J. Joyce). The circuit court subsequently granted the State's motion to dismiss the TIRC's referral with respect to both underlying cases. Johnson now appeals the denial of his motion for substitution of judge as of right, as well as the order granting the State's motion to dismiss.

¶ 2     For the following reasons, we find that the circuit court erred when it dismissed the TIRC's referral of Johnson's claims with respect to both underlying cases. Further, the circuit court erred in denying Johnson's motion for substitution of judge as of right. We thus reverse the denial of the substitution motion, vacate the dismissal order, and remand for further proceedings before a different circuit court judge.

¶ 3                                   I. BACKGROUND

¶ 4                                 The Underlying Crimes

¶ 5     Johnson's claims of torture relate to his allegedly coerced confessions regarding two separate cases, case No. 91 CR 22152 (the "Miles case") and case No. 91 CR 22460 (the "Miggins case"), which stemmed from two separate shooting incidents in 1991. The Miles case arose from a June 1991 incident in which 14-year-old Kathryn Miles was killed and three others were wounded in a shooting near 66th Street and Wolcott Avenue in Chicago. Johnson allegedly helped plan the shooting and provided weapons to the shooters. Johnson (along with

codefendant George Anderson) was charged in the Miles case with counts of first degree murder, attempted first degree murder, aggravated battery, aggravated battery with a firearm, conspiracy to commit first degree murder, and aggravated discharge of a firearm.

¶ 6    The Miggins case arose from an August 1991 incident in which 11-year-old Jeremiah Miggins was killed by a stray bullet during a shootout between gang members. Two men, Anthony Wilson and Steven Crosby, suffered gunshot wounds in that incident. Johnson, as well as codefendants Anderson and Michael Sutton, were charged with murder, attempted murder, and aggravated battery with a firearm in the Miggins case.[1]

¶ 7                      Johnson's Alleged Torture by Police and Coerced Confessions

¶ 8    According to Johnson, on the evening of August 21, 1991, he was arrested by Chicago police and brought to the Area 3 station, where he was interrogated regarding Miggins's shooting. Johnson claims that, over the course of many hours, he was handcuffed to a ring on the wall in a hot room. He was slapped and kicked by police officers who demanded that he confess. He was not provided with food, water, a restroom, or an attorney. On the morning of August 22, Johnson signed a statement that had been written by an assistant state's attorney, Joseph Brent, that described Johnson's involvement in Miggins's shooting. Johnson was subsequently questioned regarding the shooting in which Miles was killed. In the evening of August 22, Johnson signed a statement prepared by another assistant state's attorney, Brian

---

[1]Anderson was a codefendant in both the Miles and Miggins cases.

Grossman, that described Johnson's involvement in Miles's shooting. Johnson maintains that he would not have signed either statement but for his physical abuse by police.[2]

¶ 9                                     Denial of Johnson's Motion to Suppress Both Statements

¶ 10          On March 4, 1992, Johnson moved to suppress his written statements in both the Miles and Miggins cases, on the ground that he was tortured by police. The trial court held a suppression hearing, at which Johnson testified that, over the course of approximately 30 hours in custody, he was given only a can of soda but nothing else to eat or drink and that he was not allowed access to a restroom, a telephone, or an attorney. He recalled that he was handcuffed to a ring on the wall in the interview room and left alone for several hours. At approximately 2 a.m. on August 22, two unknown police officers slapped and kicked him repeatedly while he remained handcuffed. Johnson testified that, after a night of sleeping on the floor while handcuffed to the wall, he signed an inculpatory statement prepared by an assistant state's attorney "[s]o I could get out of there." The court also heard testimony from detectives John Halloran, Michael Kill, James O'Brien, and Joseph Stehlik, as well as from assistant state's attorneys Brent and Grossman, all of whom denied that they saw anyone slap or kick Johnson. The detectives acknowledged that Johnson was not given any food but claimed he did not request any when it was offered to him. The trial court denied the motion to suppress, finding that Johnson's statements were voluntary and were not a product of physical or psychological coercion.

¶ 11                                     Johnson's Guilty Plea in the Miles Case

---

[2]Anderson has similarly alleged that detectives at Area 3 interrogated and beat him until he signed confessions related to both the Miles and Miggins cases. See *In re Claim of Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.016-A (2012).

¶ 12    In September 1994, Johnson pleaded guilty in the Miles case to first degree murder and attempted first degree murder in exchange for a sentence of 30 years' imprisonment on the murder conviction, to run concurrently with a 20-year sentence for attempted first degree murder.[3]

¶ 13    At the plea hearing, the trial court (Judge Joseph Urso) admonished Johnson that he had the right to proceed to trial by jury and advised him of the possible sentences for first degree murder and attempted first degree murder. Johnson expressed his wish to give up his right to a trial. He answered affirmatively when the court asked if he was entering his plea freely and voluntarily. Johnson answered negatively when asked if anyone was forcing him to plead guilty.

¶ 14    After the judge accepted the plea, the State presented a factual basis. According to the State, the evidence would show that on June 9, 1991, Johnson, Anderson, and Eric Clark "got into a fist fight" near 66th Street and Wolcott Avenue in Chicago, after which those three men conspired with others to "get revenge" by "shoot[ing] up that area." Johnson provided firearms to three other individuals (Antonio Nicholas, Gregory Reed, and David Washington) and showed them "the corner that he needed shot up and the people that he needed shot up."[4] Those three individuals "shot up the corner," striking Miles and three others. The State indicated that Johnson "gave a handwritten statement detailing all of his actions."

_____

[3]Codefendant Anderson also entered a guilty plea in the Miles case.
[4]During the recitation of the factual basis, Johnson's counsel corrected it by stating that Anderson, not Johnson, was the person who took the shooters to the scene and waited nearby as the shootings occurred. The State agreed with that correction.

¶ 15    Prior to imposing sentence, the court read a note from Johnson in which he said he was "thankful for the offer." He acknowledged he "made a couple of mistakes that were severe which have to be paid for" but asked if the court "would consider 20 years" or a 25-year sentence with an "agreement for a time cut after five years with no problems and a few certifications from school." The trial court stated that it considered Johnson's letter but did not find a 20- or 25-year sentence appropriate. Consistent with the plea agreement, the trial court imposed a 30-year sentence for murder and a concurrent 20-year sentence for attempted murder.

¶ 16                    Direct Appeal from the Miles Conviction

¶ 17    After the plea in the Miles case, Johnson filed a *pro se* motion to vacate the guilty plea, alleging that his trial counsel was ineffective. The trial court denied the motion after an evidentiary hearing. On appeal, Johnson contended that his plea was involuntary, that he was not properly admonished regarding the sentences he faced, and that his concurrent sentences were "void." This court rejected those contentions and affirmed the trial court. *People v. Johnson*, No. 1-95-0338 (1997) (unpublished order under Illinois Supreme Court Rule 23).

¶ 18                    Trial and Conviction in the Miggins Case

¶ 19    Just before commencement of the June 1995 jury trial in the Miggins case, the State filed a motion *in limine* to bar Johnson from referring to the contents of his written confession, arguing that it was "exculpatory," self-serving, and inadmissible as hearsay. The State indicated to the court that it did not plan to use Johnson's confession in its case-in-chief. Johnson opposed the State's motion *in limine*, arguing that Johnson should be able to reference the confession in cross-examining the State's witnesses. The court granted the State's motion,

remarking that "it is a self-serving statement unless it is somehow opened up, then of course then it may go in." Johnson's confession was not introduced at trial, and Johnson did not testify. Johnson and his trial counsel from the Miggins case maintain that his decision not to testify was based on the concern that he would be impeached with the confession. At the conclusion of the jury trial, Johnson was convicted and sentenced to natural life for murder and two concurrent 30-year terms for two counts of aggravated battery with a firearm.[5] This court affirmed Johnson's convictions on direct appeal. *People v. Johnson*, No. 1-95-3312 (1998) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20                    Prior Collateral Proceedings Related to the Miggins Case

¶ 21      In 1998, Johnson filed a petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 1996)) seeking to overturn his convictions in the Miggins case. On appeal from the circuit court's dismissal of that petition, Johnson's counsel filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). This court granted that motion and affirmed the circuit court's dismissal. *People v. Johnson*, No. 1-98-4307 (1999) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 22      Johnson subsequently filed a petition pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2014)) contending that his convictions in the Miggins case were void on various grounds. The circuit court (Hon. Timothy J. Joyce) denied that petition in a June 25, 2015, order.

---

[5]Codefendants Anderson and Sutton were separately tried and convicted in the Miggins case. See *People v. Anderson*, 401 Ill. App. 3d 134, 135 (2010).

¶ 23    Johnson separately filed a motion for leave to file a successive postconviction petition in the Miggins case, including allegations that certain of his custodial statements resulted from police coercion. Judge Joyce denied that motion in a separate order issued on June 25, 2015. In finding that Johnson did not satisfy the "cause and prejudice" test, the court stated:

> "First no statements purportedly made by Petitioner during the police investigation were introduced into evidence against him. In fact, one of Petitioner's claims of error on his direct appeal was that the trial court erred in not permitting Petitioner to introduce his statements to police into evidence in *his* case-in-chief. It is specious to now claim that those un-introduced statements, which Petitioner wished to put forth in his case at trial can now somehow form the basis for a cognizable claim that Petitioner suffered a constitutional violation when those statements were not introduced against him at trial. It is thus factually and legally impossible for Petitioner to raise a creditable claim that he was prohibited from bringing this claim previously ***."

¶ 24              Collateral Proceedings Related to the Miles Case

¶ 25    In 1998, Johnson filed his initial postconviction petition in the Miles case, which was dismissed without an evidentiary hearing. In July 2011, defendant filed a *pro se* "petition to withdraw guilty plea and vacate sentence," arguing he would not have pleaded guilty had the State not suppressed evidence that he was tortured by police. The trial court dismissed that petition as untimely. On appeal, Johnson's counsel moved for leave to withdraw pursuant to

*Finley*, 481 U.S. 551. This court granted that motion and affirmed the circuit court, finding there were no issues of arguable merit. *People v. Johnson*, No. 1-11-2686 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 26    In October 2012, Johnson filed a motion for leave to file a successive postconviction petition and a proposed successive petition. Johnson argued that "newly discovered evidence of systemic police torture" rendered his plea "not knowingly and intelligently made, and therefore, void." In support of his motion, Johnson attached the TIRC's June 2012 disposition regarding the claims by codefendant Anderson, who similarly alleged that police abused him until he signed confessions related to both the Miles and Miggins cases. *In re Claim of Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.016-A (2012), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/ANDERSON%20 amended%20determination%20without%20markup.1.0.pdf [https://perma.cc/FUD7-DHWP]. In its disposition, the TIRC determined that Anderson's claim was "credible and merit[ed] judicial review." *Id.* at 4.

¶ 27    On June 25, 2015, the trial court (Judge Joyce) denied Johnson's motion for leave to file a successive postconviction petition, finding that he failed to establish the requisite cause or prejudice. Johnson appealed that denial (appeal No. 1-15-2310).[6] In January 2021, this court affirmed the circuit court. *People v. Johnson*, 2021 IL App (1st) 152310. In that opinion, we noted that Johnson "chose to plead guilty to the charges against him, and the record demonstrates that [Johnson] did so knowingly and voluntarily." *Id.* ¶ 23. We concluded: "As

---

[6]While that appeal was pending, the TIRC issued a disposition on Johnson's torture claim. This court stayed appeal No. 1-15-2310 pending circuit court proceedings regarding the TIRC's referral of Johnson's claim.

disturbing as we find the alleged torture of [Johnson], longstanding federal and state caselaw specifically makes clear that where a defendant voluntarily pleads guilty, he waives all nonjurisdictional defects, including any claim that his confession was coerced by police torture." *Id.* ¶ 38.

¶ 28                                     TIRC Proceedings and Disposition

¶ 29        In 2011, Johnson submitted a claim form to the TIRC. Johnson alleged he was "handcuffed awkwardly in a heated room that appeared to be a locker room" and that, after refusing to answer questions, he was "slapped across the head" and kicked. In the section of the claim form requesting the "Names of persons committing alleged torture," Johnson listed detectives Kill, Halloran, Boudreau, Smith, Stehlik, and O'Brien.

¶ 30        The TIRC interviewed Johnson in 2015 and 2017. The TIRC also interviewed Johnson's trial counsel from the Miles and Miggins cases. In March 2018, the TIRC issued a 21-page disposition in which it found "sufficient evidence of torture to merit judicial review of Jerome Johnson's claims of torture" with respect to both the Miles and Miggins cases.[7]

¶ 31        Significantly, separate from its factual findings, the TIRC's disposition discussed its legal conclusion that Johnson's claims with respect to both the Miles case and the Miggins case fell within the TIRC's statutory authority to review "claims of torture." See 775 ILCS 40/10 (West 2018) ("This Act establishes an extraordinary procedure to investigate and determine factual claims of torture ***."). Specifically, the TIRC concluded that Johnson's claims fell within the

---

[7] The TIRC's disposition of Johnson's claims is in the record on appeal and is also available online. *In re Claim of Johnson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.091-J, at 1 (2018), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/2018.3.29%20Johnson%20 Determination-STAMPED.1.0.pdf [https://perma.cc/K4SR-DQ6X].

statutory definition of a " '[c]laim of torture' " because the allegedly tortured confessions were "used to obtain the conviction" as that phrase is used in the TIRC Act. See 775 ILCS 40/5(1) (West 2018) (defining " 'Claim of torture' " to mean "a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction").

¶ 32    First, with respect to Johnson's guilty plea in the Miles case, the TIRC found that the allegedly coerced confession "was clearly used to obtain the conviction." *Johnson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.091-J, at 17. The TIRC noted that Johnson's confession "was cited by the prosecution in securing the plea deal" and that Johnson's lawyer in the Miles case, Ernesto Borges, indicated that the confession "was a deciding factor" in Johnson's choice to enter a guilty plea. *Id.*

¶ 33    The TIRC additionally found that the confession related to the Miggins shooting was used to obtain the conviction, insofar as Johnson was "prevented from testifying on his own behalf because, if he had, he would have been impeached with his confession." *Id.* at 18. The TIRC noted that Johnson's trial counsel from the Miggins case, Deborah Gubin, stated in an interview that she "decided not to place Johnson on the stand because the statement would have likely been introduced to impeach Johnson if he testified at the jury trial." *Id.*

¶ 34    Regarding the factual basis for his claims of torture, the TIRC found that Johnson's account was "largely consistent and similar to" the allegations he made at the June 25, 1993, suppression hearing. *Id.* at 19. The TIRC found that Johnson "has consistently maintained that he was handcuffed to a ring on the wall in a hot, dark interview room for long periods of time

without food or access to a bathroom or telephone" and that Johnson had been "resolute" that, during the night, two officers entered the room and "kick[ed] his handcuffs and slap[ped] him repeatedly." *Id.* The TIRC also noted that several of the detectives involved in the investigations of the Miles and Miggins cases "have long histories of abuse allegations, and some have recorded instances of securing confessions from the wrong person." *Id.* at 20.

¶ 35        The TIRC concluded that there was "sufficient, credible evidence of torture to refer the convictions in Cook County Circuit Court No. 91-CR-22152 and No. 91-CR-22460 to the Chief Judge for further judicial review." *Id.* at 21. The TIRC disposition recites: "This determination shall be considered a final decision of an administrative agency for purposes of administrative review under the Administrative Review Law (735 ILCS 5/3-101)." (Emphasis omitted.) *Id.*

¶ 36                    Circuit Court Proceedings Following the TIRC Disposition

¶ 37        After the March 2018 TIRC disposition, the matter was referred to the circuit court and eventually assigned to Judge Joyce.[8] The record reflects that on May 1, 2018, the parties first appeared before Judge Joyce with respect to the TIRC referral. At that time, Judge Joyce acknowledged that he had previously denied Johnson's motions for leave to file successive postconviction petitions in the Miles and Miggins cases.

---

[8]The parties' brief and the record do not make it entirely clear how this occurred. The State's brief suggests that Johnson's counsel and the State agreed to assignment to Judge Joyce. The record includes the transcript of an April 16, 2018, hearing before Judge Maria Kuriakos Ciesel, at which Johnson's counsel was not present. At that hearing, the State told the court that Johnson's counsel "agreed *** that the matter could be reassigned to Judge Joyce." However, Johnson's reply brief denies that he "acquiesced" to the assignment of the case to Judge Joyce.

¶ 38     At a hearing on April 11, 2019, Johnson's counsel informed the court that "[w]e were in discussion about a possible settlement, [but they] sort of fell through." Johnson's counsel asked the court for a scheduling order to set a date for an evidentiary hearing. Johnson's counsel indicated a desire to conduct prehearing discovery, including "some depositions of the officers, interrogatories, document requests, RFAs."

¶ 39     On May 29, 2019, Johnson filed an "Unopposed Motion for Pre-hearing Discovery" in which he sought leave to seek certain discovery, including "Requests for production of any documents produced by the State in the Anthony Jakes and George Anderson TIRC cases" and "Requests for production of any transcripts from the Anthony Jakes and George Anderson TIRC hearings."[9] Johnson also sought leave to serve: "Interrogatories and other written discovery [on] the following individuals: (1) Detective John Halloran; (2) Detective James O'Brien; (3) Detective Joseph Stehlik; (4) Detective Kenneth Boudreau; and (5) Assistant State's Attorney Brent." In the motion, Johnson "reserve[d] the right" to seek leave to depose those individuals after receipt of written discovery.

¶ 40     At a hearing on May 29, 2019, the court expressly authorized Johnson to obtain certain documents, including transcripts from hearings on other TIRC claims. Johnson's counsel reiterated its request for leave to serve "one interrogatory to each of the five officers" identified in the motion, explaining: "[W]e would craft interrogatories to be something where a couple

---

[9]Jakes's TIRC claim alleged that Detectives Kill and Boudreau coerced a confession used to convict him in an unrelated case, No. 92 CR 5073. *In re Claim of Jakes*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.035-J (2013), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/JAKES%20amended%20deter%20%20without%20markup.1.0.pdf [https://perma.cc/UJ4X-CKXU].

of parts, you know, do you admit you were there, do you have any other evidence that you want to provide just so we, when we get here, we are not totally taken aback by what we get."

¶ 41    With respect to interrogatories, the court told Johnson's counsel: "I am going to deny your request for permission to use interrogatories for nonparties at this time." The court indicated it did not believe such interrogatories were authorized under the TIRC Act, the Post-Conviction Hearing Act, or the Code of Civil Procedure. The court commented that it suspected there was already a "wealth of information" available about certain of the named detectives "that permits Mr. Johnson and his attorney to [be] beyond well prepared in connection with this so I don't think it's necessary for that purpose." However, the court indicated that it could reconsider after the State's document production:

> "If you want to come back and convince me that I am wrong after
>
> you get these probably voluminous documents *** if you can
>
> convince me that I am wrong, I will give you that opportunity. But
>
> I don't want to give you false hopes so I am going to say no, right
>
> now."

¶ 42    At a hearing on September 13, 2019, Johnson's counsel informed the court that the parties were "in the midst of document discovery" and indicated Johnson's desire to "tak[e] some depositions of the officers in this case" before an evidentiary hearing. The trial court expressed hesitation about whether to allow depositions at that time, suggesting they might not be necessary to resolve one or more of Johnson's claims:

> "I'm hesitating because I don't know what the State's
>
> attorney's position is on depositions. I keep having to wrap my

mind around the fact that I appreciate the commission has brought this matter forward. Going from there.

But the statement that was purportedly compelled from Mr. Johnson wasn't used in his case. And I don't know what that means and I don't know procedurally how we ought to move forward on that ***. And I'm not litigating anything. I'm not suggesting I have any preconceptions. But it's really an issue that I don't want to say troubles me, but the forefront of my thoughts on the case.

And I say I have thoughts on the case, so the record's clear, because I received not one, but two fairly substantial petitions that Mr. Johnson had in the past. So I have a little more insight into the case ***.

I'm not looking to resolve this, not looking for anybody to say this is our position and you have to do this or no, you can't do this. But I almost have the sense that I ought to resolve how I believe the matter ought to move forward before we start scheduling depositions and people do a lot of things that maybe because of my new suspicions, won't be happening in any event. Depending on how I might conclude how we ought to move forward."

¶ 43    The court proceeded to suggest that, before any depositions, it should resolve any potential motion to dismiss that might preclude the need for an evidentiary hearing: "if there are going to be motions that would *** keep it from going to an evidentiary hearing, I'd want to hear those, too." The state's attorney responded that "I think the Miggins case will probably have to go to an evidentiary hearing but the Miles case may be subject to briefing and we are certainly open to doing that." After the State indicated that it planned to file such a motion, the court stated that it would not yet decide the issue of depositions: "Resolve that and go from there and figure out because if something gets dismissed, there's no point having done six evidence depositions or discovery depositions. Waste of time for all of us, most especially for you all."

¶ 44                    The State's Motion to Dismiss the TIRC Disposition

¶ 45    On October 8, 2019, the State filed a motion to dismiss the TIRC disposition with respect to both the Miles and Miggins cases. Regarding the Miles case, the State argued that Johnson's guilty plea waived any claim that his confession was involuntary. The State cited *People v. Phelps*, 51 Ill. 2d 35, 38 (1972), for the principle that "a voluntary plea of guilty waives all nonjurisdictional errors." Thus, the State claimed that Johnson's plea warranted dismissal of the TIRC claim with respect to the Miles case.

¶ 46    With regard to the Miggins case, the State asserted that Johnson lacked standing under the TIRC Act, insofar as the statutory definition of a " '[c]laim of torture' " requires that the "tortured confession was used to obtain the conviction." 775 ILCS 40/5(1) (West 2018). The State urged that, since the allegedly coerced confession "was not used or introduced by the

State" at the trial of the Miggins case, Johnson "lack[ed] standing to assert that he was tortured into confessing to the crime for which he was convicted."

¶ 47                     Johnson Moves for Substitution of Judge As of Right

¶ 48        On October 8, 2019, Johnson filed a motion for substitution of judge as of right pursuant to section 2-1001(a)(2)(i) of the Code (735 ILCS 5/2-1001(a)(2)(i) (West 2018)). In that filing, Johnson asserted the motion was "timely as this Court has not ruled on any substantive issues in this case, and there has not been any trial or hearing on any substantive matter prior to filing this motion." Johnson also stated in the motion that "Judge Joyce had presided over Mr. Johnson's earlier post-conviction proceedings, and, as a result, should not have been assigned this matter in the first instance." In support, Johnson cited the administrative regulation that, upon a referral to the circuit court, the chair of the TIRC "shall recommend that the case be assigned to a judge other than the judge who tried the criminal case and other than the judge who presided over any previous post-conviction proceedings." 20 Ill. Adm. Code 2000.50(b) (2017).

¶ 49        At a hearing on December 18, 2019, the trial court denied the motion for substitution of judge. After noting the lack of supreme court or appellate court decisions on point, the court found that section 2-1001 of the Code did not apply to a circuit court proceeding following a TIRC referral. The court commented that case law cited by the State indicated that "there is nothing wrong with a proceeding under the Postconviction Hearing Act or under this very analogous TIRC Commission authorizing legislation to be assigned to and resolved by a judge who may have presided over prior proceedings in connection with a particular case." The court acknowledged it had issued rulings denying Johnson's requests for postconviction relief but

emphasized that it did not preside over his guilty plea in the Miles case, his trial in the Miggins case, or any proceeding involving a "factual resolution" as to whether Johnson was tortured.

¶ 50    At one point during the hearing, the State raised the issue of whether the court had already "ruled on any substantive matters" that would otherwise make the substitution motion untimely. The court commented that it had "broached some discovery issues" but did not believe it had made "a substantive ruling in the case" that would render the motion untimely under section 2-1001. Instead, the court denied the motion upon finding that section 2-1001 did not apply to a TIRC review proceeding.

¶ 51                    The Trial Court Grants the State's Motion to Dismiss

¶ 52    On October 2, 2020, the circuit court entered an order granting the State's motion to dismiss the TIRC claim with respect to both the Miles case and the Miggins case. With respect to the Miles case, the circuit court agreed with the State that a "voluntary plea of guilty waives any and all non-jurisdictional issues, including a claim that a confession or statement was coerced." On that basis, the court dismissed the TIRC referral to the extent it concerned the Miles case.

¶ 53    In the same order, the court dismissed the TIRC referral concerning the Miggins case because Johnson's statements were not "used to obtain the conviction" within the meaning of the TIRC Act. The court declined to afford deference to the TIRC's conclusion on this point. The court proceeded to find that the confession could not have been "used to obtain the conviction" in the Miggins case, since the State did not introduce it at trial.

¶ 54    The court further emphasized that it was Johnson who sought (unsuccessfully) to use his statements to cross-examine State witnesses and that he had again raised this issue on direct appeal "but now claims that he did not want the statements admitted in his case." The court

recited the principle that "[a] litigant cannot take one position in some previous part of the case litigation, and then take a diametrically opposed position thereafter in connection with the same litigation." The court found Johnson's position was "so inconsistent that it crosses into *** the realm of the ridiculous." For those reasons, the circuit court granted the State's motion to dismiss the TIRC referrals for both the Miles and Miggins cases.

¶ 55       On December 21, 2020, Johnson moved for leave to file a late notice of appeal, specifying that he sought to challenge (1) the denial of the motion to substitute judge as of right and (2) the order granting the State's motion to dismiss. This court allowed that motion.

¶ 56                                      II. ANALYSIS

¶ 57       Johnson raises four distinct issues on appeal pertaining to the denial of his substitution motion, as well as the subsequent order granting the State's motion to dismiss. Johnson first contends that the circuit court erred in denying his motion to substitute judge as a matter of right pursuant to section 2-1001(a)(2) of the Code. 735 ILCS 5/2-1001(a)(2) (West 2018). Johnson also asserts three distinct arguments as to why the court erred in granting the State's motion to dismiss, contending that (1) the trial court did not afford the proper deference to the TIRC's findings with respect to both underlying cases, (2) with respect to the Miles case, his guilty plea did not waive his right to seek relief under the TIRC Act, and (3) with respect to the Miggins case, the court erred in finding that the confession was not "used" to obtain his conviction within the meaning of the TIRC Act.

¶ 58       Because these arguments raise important issues of first impression regarding the TIRC Act, and in the interest of judicial economy, we elect to address each of the issues raised. We will

address the propriety of the circuit court's dismissal order before discussing its denial of Johnson's substitution motion.

¶ 59                    We Review the Circuit Court's Dismissal Order *De Novo*

¶ 60        Before discussing Johnson's three specific challenges to the order granting the State's motion to dismiss, we note our standard of review regarding that dismissal. Although the TIRC Act does not specifically contemplate a motion to dismiss, our court has applied *de novo* review to circuit court orders granting the State's motions to dismiss TIRC referrals. See *Mitchell v. State*, 2016 IL App (1st) 141109, ¶ 14 (applying *de novo* review to orders granting State's motions to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)). We note that, in this matter, the State's motion to dismiss did not specify that it was brought pursuant to section 2-615 of the Code or any other statute. However, the State sought dismissal on purely legal grounds, namely (1) that Johnson's guilty plea precluded relief under the TIRC Act for the Miles case and (2) that Johnson could not state a claim for relief under the TIRC Act with respect to the Miggins case because his confession was not introduced at trial. In deciding the motion to dismiss, the trial court did not make any findings of fact. Therefore, *de novo* review is appropriate. See *Schacht v. Lome*, 2016 IL App (1st) 141931, ¶ 33 (in reviewing dismissal of complaint pursuant to section 2-619(a)(3) of the Code (735 ILCS 5/2-619(a)(3) (West 2012)), "[s]ince the motion does not require the trial court to weigh facts or determine credibility, *de novo* review is appropriate").

¶ 61        We find that *Mitchell*, 2016 IL App (1st) 141109, is procedurally analogous and instructive in our review of the circuit court's order on the motion to dismiss. The consolidated appeal in *Mitchell* concerned TIRC dispositions for two separate petitioners, both of whom alleged

police torture that occurred after Jon Burge was no longer with the Chicago Police Department. *Id.* ¶ 2. In separate dispositions, the TIRC found there was sufficient evidence to warrant judicial review, and the matters were assigned to separate circuit court judges. *Id.* ¶¶ 7-8. The State filed motions to dismiss, asserting that the petitioners "failed to state a valid cause of action under the Torture Act because neither case involved any allegations or evidence" that petitioners were tortured by Jon Burge or any officers under his command. *Id.* ¶ 8.[10] Both motions to dismiss were granted, and the petitioners' appeals were consolidated. *Id.* ¶¶ 10-12.

¶ 62        On appeal, petitioners argued, *inter alia*, that the trial court erred in dismissing their cases because they "fell within the scope of those cases that could be reviewed by the TIRC pursuant to the clear and unambiguous language" of the TIRC Act. *Id.* ¶ 15. They further argued that, even if the statutory language was ambiguous, extrinsic sources showed the TIRC Act was "intended to encompass cases *** where torture occurred at the hands of officers previously under Jon Burge's command." *Id.*

¶ 63        Our court recognized that construction of the TIRC Act "presents a question of law which we review *de novo*." *Id.* ¶ 24. We noted that, if statutory language is clear and unambiguous, it should be applied "as written, without resort to extrinsic aids of statutory construction." (Internal quotation marks omitted.) *Id.* However, if statutory language is ambiguous, it is

---

[10]At the relevant time for purposes of the *Mitchell* decision, the TIRC Act's definition of a "claim of torture" specifically referenced Burge. 775 ILCS 40/5(1) (West 2012) (" 'Claim of torture' means a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction and for which there is some credible evidence *related to allegations of torture committed by Commander Jon Burge or any officer under the supervision of Jon Burge*.") (Emphasis added). There is no reference to Burge in the current version of the statutory definition of "claim of torture," which became effective July 29, 2016. 775 ILCS 40/5(1) (West 2018).

"appropriate to resort to other aids of construction to determine legislative intent. [Citations]." *Id.*

¶ 64 Our court in *Mitchell* proceeded to find that the TIRC Act's definition of "claims of torture" was ambiguous, as it was "susceptible to two reasonable interpretations." *Id.* ¶ 25. That is, it could be read broadly to include claims of torture "by officers formerly under Jon Burge's command" (*id.*) or more narrowly, to only include claims of torture "committed by Jon Burge or an officer presently under his command" (*id.* ¶ 26).

¶ 65 The *Mitchell* court noted that "courts will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute. [Citations.]" *Id.* ¶ 27. The court found that prior TIRC decisions made it "clear that the TIRC interprets the definition of 'claims of torture' to include those claims of torture committed by officers previously under Jon Burge's command." *Id.* ¶ 28. The *Mitchell* court "defer[red] to the TIRC's interpretation" and reversed the circuit court's findings that the petitioners' claims fell outside the TIRC's jurisdiction. *Id.* ¶ 29. Accordingly, this court reversed the dismissal orders and directed the circuit court to review the petitioners' claims. *Id.*

¶ 66 *Mitchell* helps illustrate the proper path for our analysis in this appeal, which similarly comes before us upon an order granting the State's motion to dismiss. The order granting the State's motion to dismiss is reviewed *de novo*, as are questions of statutory interpretation. However, if a relevant TIRC Act provision is ambiguous, the TIRC's interpretation of that provision is entitled to substantial weight and deference.

¶ 67          Whether the Circuit Court Owed Deference to the TIRC's Findings With Respect to

Both Underlying Cases

¶ 68          We turn to Johnson's primary argument regarding the order granting the State's motion to

dismiss, in which he claims the circuit court failed to provide the requisite deference to the

TIRC's conclusions (with respect to both the Miles and Miggins cases). Specifically, Johnson

maintains that he was entitled to an evidentiary hearing, unless the circuit court concluded that

the TIRC's finding of sufficient "credible" evidence of torture was against the manifest weight

of the evidence. Johnson further suggests that the circuit court owed such deference to the

TIRC's conclusions that his guilty plea did not preclude his claim in the Miles case and that

his confession in the Miggins case was "used to obtain the conviction" within the meaning of

the TIRC Act. We address these contentions in turn.

¶ 69          Johnson Was Entitled to an Evidentiary Hearing Absent a Finding That the TIRC's

Determination Was Against the Manifest Weight of the Evidence

¶ 70          We first agree with Johnson that the circuit court was required to conduct an evidentiary

hearing, absent an explicit finding by the circuit court that the TIRC's finding of sufficient

evidence of torture to warrant judicial review was against the manifest weight of the evidence.

This conclusion follows from the language of the TIRC Act, as well as the Administrative

Review Law, which the TIRC Act expressly incorporates.

¶ 71          The TIRC Act "establishes an extraordinary procedure to investigate and determine factual

claims of torture" (775 ILCS 40/10 (West 2018)) and establishes the TIRC as an "independent

commission under the Illinois Human Rights Commission for administrative purposes." *Id.*

§ 15(a). The TIRC consists of eight voting members (*id.* § 20(a)), whose duties include

"conduct[ing] inquiries into claims of torture" and "prepar[ing] written reports outlining Commission investigations and recommendations to the trial court at the completion of each inquiry." *Id.* § 35. After hearing evidence, TIRC members "vote to establish further case disposition[s]." *Id.* § 45(c). If a majority "conclude[s] by a preponderance of the evidence that there is sufficient evidence of torture to merit judicial review, the case shall be referred to the Chief Judge of the Circuit Court of Cook County" with the supporting findings of fact and record. *Id.*

¶ 72    Section 50 of the TIRC Act clearly contemplates that, upon the TIRC's threshold determination that there is sufficient evidence of torture to warrant judicial review, the circuit court shall conduct an evidentiary "hearing":

> "If the [TIRC] concludes there is sufficient evidence of torture to
> merit judicial review, the Chair of the [TIRC] shall request the
> Chief Judge of the Circuit Court of Cook County for assignment to
> a trial judge for consideration. *The court may receive proof by
> affidavits, depositions, oral testimony, or other evidence. In its
> discretion the court may order the petitioner brought before the
> court for the hearing*." (Emphasis added.) *Id.* § 50(a).

¶ 73    Furthermore, in describing judicial review of a TIRC decision, section 55(a) of the TIRC Act explicitly incorporates the Administrative Review Law: "Unless otherwise authorized by this Act, the decisions of the Commission *are final and are subject to review as final decisions under the provisions of the Administrative Review Law, and shall only be overturned if the*

*court finds that they are against the manifest weight of the evidence.*" (Emphasis added.) *Id.* § 55(a).

¶ 74    Read together, the statutory provisions of the TIRC Act thus make clear that (1) the TIRC's finding of sufficient evidence of torture to refer a claim for judicial review contemplates that the circuit court will hold an evidentiary hearing as part of that review and (2) the TIRC's determination that an evidentiary hearing is warranted is a "final" determination that can only be overturned if the court finds it is against the manifest weight of the evidence. In other words, we read the TIRC Act to require the circuit court to hold an evidentiary hearing upon referral from TIRC, *unless* the circuit court finds that the TIRC's finding of "sufficient evidence of torture to merit judicial review" (*id.* § 45(c)) was "against the manifest weight of the evidence" (*id.* § 55(a)).

¶ 75    This conclusion is supported by the Administrative Review Law and related case law. Section 3-110 of the Code provides that "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2018). Our supreme court has also made clear that

> "[i]n examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. Instead, *a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence.* An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. (Emphasis added.)

[Citations.]" *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 76    Importantly, we recognize that TIRC's role is not to determine whether torture *actually occurred*. See *People v. Christian*, 2016 IL App (1st) 140030, ¶ 79 ("The Commission is not asked to make a final determination as to whether a claimant in fact proved that he was tortured."). Rather, the TIRC merely makes a threshold determination as to whether there is "sufficient evidence of torture to merit judicial review." 775 ILCS 40/50 (West 2018). That is, we do not mean to suggest the circuit court must defer to the TIRC in reaching an ultimate conclusion as to whether any petitioner was, in fact, tortured. Rather, we hold that, upon referral from the TIRC, the circuit court should proceed to hold an evidentiary hearing, unless the circuit court finds that the TIRC's threshold determination was itself against the manifest weight of the evidence. Then, based on the evidence adduced at the evidentiary hearing, the circuit court can independently make factual findings as to whether torture actually occurred.

¶ 77    "Manifest Weight of the Evidence" Review Does Not Apply to the TIRC's

Resolution of Questions of Law

¶ 78    We reach a different conclusion, insofar as Johnson argues that the circuit court should have applied "manifest weight of the evidence" deference to the TIRC's conclusions that (1) his guilty plea did not bar his claim in the Miles case and (2) his confession was not "used" to obtain his conviction in the Miggins case, within the meaning of the TIRC Act. As these are legal questions, "manifest weight of the evidence" deference is inapplicable.

¶ 79    We again recognize that section 55(a) of the TIRC Act states: "Unless otherwise authorized by this Act, the decisions of the Commission are final and are subject to review as final

decisions under the provisions of the Administrative Review Law, and shall only be overturned if the court finds that they are against the manifest weight of the evidence." *Id.* § 55(a). However, reading this in conjunction with other provisions of the TIRC Act, we think this contemplates manifest weight of the evidence review only in regard to the TIRC's factual determination of whether there is sufficient evidence of torture to warrant judicial review.

¶ 80 This conclusion follows from the statutory language that TIRC decisions are subject to review "under the provisions of the Administrative Review Law." *Id.* The Administrative Review Law provides that "[t]he findings and conclusions of the administrative agency *on questions of fact* shall be held to be prima facie true and correct." (Emphasis added.) 735 ILCS 5/3-110 (West 2018). However, the Administrative Review Law and related precedent do not suggest that this same deference is owed to an agency's conclusions on questions of law. As explained by our supreme court, the level of deference owed to the agency's decision depends on whether review implicates questions of fact or questions of law:

> "The Administrative Review Law provides that judicial review of an administrative agency decision 'shall extend to all questions of law and fact presented by the entire record before the court.' 735 ILCS 5/3-110 (West 2002). The standard of review, 'which determines the degree of deference given to the agency's decision,' turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). An agency's conclusion on a question of law

is reviewed *de novo.* [Citation.] A reviewing court is not bound by an agency's interpretation of a statute [citation], but the agency's interpretation remains relevant where there is a reasonable debate about the meaning of the statute [citation]. An agency's conclusion on a question of fact is reviewed with more deference. See 735 ILCS 5/3-110 (West 2002) ('The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct'). A reviewing court does not reweigh the evidence before the agency; instead, it simply determines whether the agency's decision is against the manifest weight of the evidence. [Citation.]" *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471-72 (2005).

¶ 81    Our supreme court further explained that "[a] mixed question of law and fact asks the legal effect of a given set of facts," under which "a reviewing court must determine whether established facts satisfy applicable legal rules." *Id.* at 472. "An agency's conclusion on a mixed question of law and fact is reviewed for clear error. [Citations.] Such review is significantly deferential to an agency's experience in construing and applying the statutes that it administers. [Citation.]" *Id.*

¶ 82    With these principles in mind, we disagree with Johnson's suggestion that "manifest weight of the evidence" deference was owed to the TIRC's conclusion as to whether his guilty plea precluded relief under the TIRC Act. That conclusion did not involve any finding of fact. Rather, our supreme court has indicated that whether a guilty plea precludes a statutory claim

is a question of law, subject to *de novo* review. See *People v. Reed*, 2020 IL 124940, ¶ 20 (in deciding "whether a guilty plea prevents a defendant from asserting an actual innocence claim" under the Post-Conviction Hearing Act, noting "[t]his issue involves questions of law that are subject to *de novo* review."). Thus, the TIRC was not entitled to deference on that point. See *Comprehensive Community Solutions*, 216 Ill. 2d at 471 ("An agency's conclusion on a question of law is reviewed *de novo*."); *Engle v. Department of Financial & Professional Regulation*, 2018 IL App (1st) 162602, ¶ 29 ("An administrative agency's decision on a question of law is not binding on a reviewing court and is subject to *de novo* review.").

¶ 83    We also disagree with Johnson's suggestion that the trial court was obligated to give "manifest weight of the evidence" deference to the TIRC's conclusion as to whether Johnson's conviction in the Miggins case was "used to obtain the conviction" within the TIRC Act's definition of a "claim of torture." In this respect, we are guided by our decision in *Mitchell*, 2016 IL App (1st) 141109, which similarly reviewed a circuit court's dismissal of TIRC referrals on the ground that the claims did not fall within the scope of the TIRC Act's definition of "claim of torture." Our court in *Mitchell* did not suggest the circuit court should have applied "manifest weight of the evidence" deference to the TIRC. Rather, *Mitchell* recognized that "construction of [the TIRC Act] presents a question of law which we review *de novo*." *Id.* ¶ 24. The *Mitchell* court ultimately found that deference was owed to the TIRC's interpretation of the TIRC Act, but only after it independently determined that the statutory provision at issue was ambiguous. *Id.* ¶¶ 27-29. That is, *Mitchell* reflected our supreme court's instruction that "[a] reviewing court is not bound by an agency's interpretation of a statute [citation], but the

agency's interpretation remains relevant where there is a reasonable debate about the meaning of the statute [citation]." *Comprehensive Community Solutions*, 216 Ill. 2d at 471.

¶ 84     Thus, we do not find that the circuit court was required to give "manifest weight of the evidence" deference to the TIRC's legal conclusions as to (1) whether Johnson's plea in the Miles case precluded relief under the TIRC Act or (2) whether the confession in the Miggins case was "used to obtain a conviction" within the meaning of the TIRC Act. Nevertheless, this does not impact our determination that, on the merits, the circuit court's dismissal order was erroneous with respect to both the Miles and Miggins case. We turn to address separately the circuit court's stated reasons for the dismissal of the TIRC claim for both cases.

¶ 85                    The Miles Case Torture Claim Was Not Barred by the Guilty Plea

¶ 86     Regarding the dismissal of the TIRC claim arising from the Miles case, Johnson asserts that the circuit court erred in concluding that his guilty plea waived his ability to seek relief under the TIRC Act. He notes that the TIRC has "referred at least five cases where the defendant pled guilty in the underlying case" to the circuit court for judicial review. He also points out that two decisions of our court have discussed torture claims by petitioners who pleaded guilty, without suggesting that the plea barred relief under the TIRC Act. See *Mitchell*, 2016 IL App (1st) 141109 (reversing dismissal orders and remanding for proceedings with respect to two petitioners, one of whom pleaded guilty); *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 1 (in consolidated appeals from denial of motion for leave to file successive postconviction petition and denial of a "combined petition" under Post-Conviction Hearing Act and the TIRC Act, finding that petitioner who pleaded guilty was entitled to a new suppression hearing).

¶ 87    Johnson recognizes our supreme court's statement that "a voluntary plea of guilty waives all nonjurisdictional errors." *Phelps*, 51 Ill. 2d at 38. However, he emphasizes that no appellate court or supreme court decision has held that this waiver rule applies in the context of a TIRC Act claim. He also points out that our supreme court recently held that a guilty plea does not bar a postconviction claim of actual innocence. *Reed*, 2020 IL 124940, ¶ 57. Johnson independently argues that his 1992 guilty plea cannot be deemed a voluntary, knowing, and intelligent waiver of his right to seek relief under the TIRC Act because the TIRC Act was not enacted until 2009.

¶ 88    We find that Johnson's latter argument is dispositive on the waiver issue. That is, we agree that his guilty plea could not waive his right to assert a claim under the TIRC Act, a statutory right that did not come into existence until many years later.

¶ 89    This conclusion follows from the principle that "a waiver is an intentional relinquishment or abandonment of a known right or privilege. [Citations.]" *People v. Lesley*, 2018 IL 122100, ¶ 36. A statutory right may be waived "so long as the defendant's waiver is voluntary, knowing, and intelligent. [Citations.]" *Id.* ¶ 50 (discussing waiver of statutory right to appointed counsel in proceedings under the Post-Conviction Hearing Act). Our supreme court has made clear that "[t]he requirement of a knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* ¶ 51. Applying the meaning of "waiver" to this case, Johnson could not possibly have had a "full awareness" that he was abandoning any right under the TIRC Act when he pleaded guilty in 1992, for the simple reason that the TIRC Act was not yet enacted at that time.

¶ 90    In reaching this conclusion, we recognize the precedent regarding the preclusive effect of a guilty plea, at least with respect to proceedings under the Post-Conviction Hearing Act. In *Phelps*, 51 Ill. 2d 35, our supreme court affirmed the denial of a postconviction petition in which defendant claimed his confession was coerced, rendering his confession and subsequent guilty plea involuntary. The *Phelps* court held:

> "It is unnecessary to determine the legality of petitioner's original detention or the voluntary nature of his confession since a voluntary plea of guilty waives all nonjurisdictional errors. [Citation.] Likewise, that petitioner may have been motivated by his coerced confession does not invalidate his otherwise knowing and intelligent plea of guilty [citations], since that plea represented a voluntary and intelligent choice of the alternatives available to him. [Citations.]" *Id.* at 38.

¶ 91    Relying on *Phelps* and similar precedent, our 2021 opinion regarding Johnson's motion for leave to file a successive postconviction petition recognized: "Illinois courts have repeatedly held that claims regarding the voluntariness of defendants' confessions are barred by the rule that voluntary guilty pleas waive all nonjurisdictional defects." *Johnson*, 2021 IL App (1st) 152310, ¶ 21 (citing *Phelps*, 51 Ill. 2d at 38, and *People v. Stice*, 160 Ill. App. 3d 132, 138-39 (1987) (affirming denial of defendant's motion to withdraw plea and rejecting his request to remand for a hearing on the voluntariness of his confession, where defendant voluntarily pleaded guilty, admitted his wrongdoing, and used the relinquishment of his right to challenge his confession as a bargaining chip in negotiating a recommended sentence)). We affirmed the

denial of Johnson's motion for leave to file a successive postconviction petition because Johnson's "guilty plea resulted in waiver of his claims regarding the voluntariness of his confession." *Id.* ¶ 20.

¶ 92    Significantly, however, our prior opinion solely concerned Johnson's attempt to assert a successive petition under the Post-Conviction Hearing Act; it has no impact on the validity of Johnson's TIRC Act claim. Indeed, in our opinion we explicitly stated:

> "We do not and will not assess the legal and factual soundness of the trial court's decision on defendant's TIRC claim unless and until such an appeal is placed before this court. Accordingly, our decision in this appeal should in no way be construed as a reflection of our opinion on the propriety of the trial court's dismissal of defendant's TIRC claim." *Id.* ¶ 41.

Thus, our 2021 opinion in Johnson's separate appeal does not preclude us from now concluding that his guilty plea did *not* waive his right to seek relief under the TIRC Act.

¶ 93    The State does not identify any case (and we are aware of none) holding that a guilty plea entered *before* the passage of the TIRC Act waives the right to assert a claim of torture under that law. This is not surprising, since we cannot see how a plea could be construed as a "voluntary, knowing, and intelligent" waiver of a statutory right that had not yet come into existence. *Lesley*, 2018 IL 122100, ¶ 50. The TIRC Act, which established an "extraordinary procedure to investigate and determine factual claims of torture" (775 ILCS 40/10 (West 2018)), had not yet been enacted at the time of Johnson's plea. Thus, it cannot be said that Johnson's decision to plead guilty was an informed strategic decision to give up his right to relief under the TIRC Act in order to receive a lesser sentence. When Johnson pleaded guilty,

he certainly could not have had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Lesley*, 2018 IL 122100, ¶ 51.

¶ 94    We recognize that, in our prior opinion, we found that Johnson "chose to plead guilty to the charges against him, and the record demonstrates that [Johnson] did so knowingly and voluntarily." *Johnson*, 2021 IL App (1st) 152310, ¶ 23. In so doing, we noted that the trial court admonished him that he "was giving up his rights to be proven guilty beyond a reasonable doubt, a jury trial, confront and cross-examine witnesses, and present witnesses and evidence on his own behalf." *Id.* We also pointed out that Johnson "acknowledged his culpability in his letter to the court," in which he stated he made " 'mistakes that were severe which have to be paid for.' " *Id.*

¶ 95    Nevertheless, those findings do not impact our conclusion that the plea did not waive his right to make a TIRC Act claim. Although Johnson was admonished that a plea would waive his right to proceed to a trial and related constitutional guarantees, his awareness of those rights has no bearing as to whether he could have knowingly waived his right to assert a TIRC Act claim. Clearly, he could not have had such knowledge before the TIRC Act was enacted. Similarly, his letter to the court acknowledging "mistakes" reflects a common practice by defendants seeking leniency from the trial court at sentencing. It is irrelevant to whether his plea could waive a statutory right that did not yet exist.

¶ 96    We also note that our conclusion on this point is consistent with the rationale underlying our supreme court's recent decision in *Reed*, 2020 IL 124940, which held that a guilty plea does *not* waive a claim of actual innocence under the Post-Conviction Hearing Act. *Id.* ¶ 41 ("This court refuses to turn a blind eye to the manifest injustice and failure of our criminal

justice system that would result from the continued incarceration of a demonstrably innocent person, even where a defendant pleads guilty. [Citation.] Accordingly, we find defendants who plead guilty may assert an actual innocence claim under the Act. [Citations.]"). Our supreme court in *Reed* emphasized the "long-established preference for life and liberty over holding defendant to his plea" and recognized that "sometimes a manifest injustice outweighs the consequences of defendant's voluntary plea." *Id.* ¶ 36. As this court has previously observed, although *Reed*'s holding was limited to a claim of actual innocence, it "suggests that the wall guilty pleas place between criminal defendants and relief for nonjurisdictional defects might not be quite as tall as once thought." *Johnson*, 2021 IL App (1st) 152310, ¶ 40.

¶ 97    We also address, though the parties did not, our supreme court's recent decision in *People v. Jones*, 2021 IL 126432. The court rejected a juvenile defendant's successive postconviction claim for sentencing relief under *Miller v. Alabama*, 567 U.S. 460 (2012), because the United States Supreme Court decided *Miller* years after the defendant's plea. *Jones*, 2021 IL 126432, ¶ 28. Our supreme court reasoned that pleas are generally " 'bet[s] on the future,' " including " 'future favorable legal developments.' " *Id.* ¶ 21 (quoting *Dingle v. Stevenson*, 840 F.3d 171, 175 (4th Cir. 2016)). We find *Jones* distinguishable.

¶ 98    Unlike the defendant in *Jones*, Johnson has claimed from the beginning that his confessions were coerced by torture; in other words, he is not relying on " 'future favorable legal developments' " (see *id.*). True, the TIRC Act provides procedures that did not exist at the time of Johnson's plea, but as the Act itself confirms, it is a mechanism "to investigate and determine *factual* claims of torture." (Emphasis added.) 775 ILCS 40/10 (West 2018). In this way, Johnson's claim is much more like a claim of actual innocence, in that he always knew

his confessions were tortured but he "could not reasonably discover [supporting] evidence" of torture "at the time of his plea." See *Reed*, 2020 IL 124940, ¶ 40. Similar to a claim of innocence, Johnson's torture claim is not based on his "misapprehension of the quality of the State's case nor an error of the court in finding [him] guilty." *Id.* His plea does not waive his torture claim simply because the TIRC Act is a new procedural device for proving it.

¶ 99    In short, we conclude that Johnson's 1992 plea in the Miles case could not have constituted "an intentional relinquishment or abandonment of a known right" to seek relief under the TIRC Act (*Lesley*, 2018 IL 122100, ¶ 36), as Johnson could not have known of his rights under a statute that did not exist at the time of the plea. For that reason, the trial court erred in dismissing the TIRC's referral with respect to the Miles case.

¶ 100    The Miggins Case TIRC Referral Should Not Have Been Dismissed

¶ 101    Having discussed the erroneous dismissal of the Miles case, we now address the portion of the circuit court's order dismissing the TIRC referral of the Miggins case. Notably, the trial court gave two distinct reasons for that ruling. First, the trial court agreed with the State that the allegedly coerced statement in the Miggins case was not "used to obtain the conviction" so as to meet the definition of a " '[c]laim of torture' " subject to the TIRC Act. See 775 ILCS 40/5 (West 2018). The circuit court based this conclusion on the fact that, "at trial, it was *Defendant* [(Johnson)] who wished for those statements to be admitted into evidence *** during cross-examination of State witnesses," after the State indicated it would not seek to introduce Johnson's confession in its case-in-chief.

¶ 102    Separately, the trial court indicated that its ruling on the Miggins case was also based on the principle that "[a] litigant cannot take one position in some previous part of the case

litigation, and then take a diametrically opposed position thereafter in connection with the same litigation." The court emphasized that Johnson had sought permission to use his confession to cross-examine State witnesses at trial but now claimed that "he received an unfair trial because those same statements might have been admitted, had he testified."

¶ 103     In this appeal, Johnson maintains that his allegedly coerced statement was "used to obtain the conviction" in the Miggins case, within the meaning of the TIRC Act's definition of a " '[c]laim of torture.' " *Id.* He urges that the trial court should have deferred to the TIRC's interpretation of that phrase, under which a coerced statement need *not* have been introduced at trial to be considered "used" to obtain the conviction. He argues that his confession was "used" to obtain his conviction, because he declined to testify at trial in order avoid being impeached with it.

¶ 104     Johnson does not explicitly discuss the trial court's finding that his TIRC claim in the Miggins case is inconsistent with his position at trial. However, he suggests his position at trial was a reasonable strategy, explaining (1) before the State's motion *in limine*, the trial court had already denied his motion to suppress his statement, (2) his trial counsel "made a strategic decision to oppose the State's motion *in limine* so that she could preserve the option of cross-examining the State's witnesses with Mr. Johnson's statement" to "defuse the impact of the confession being heard by the jury for the first time during Mr. Johnson's testimony," and (3) the trial court's ruling on the State's motion *in limine* prevented Johnson from introducing the confession during the State's case-in-chief but permitted the State to impeach Johnson with it if he testified, which (4) "prevented him from taking the stand" to avoid the jury hearing the confession.

¶ 105    For the following reasons, we find that the circuit court erred in dismissing the TIRC claim concerning the Miggins conviction.

¶ 106    The Confession in the Miggins Case Was "Used" to Obtain the Conviction

¶ 107    We first address the propriety of the trial court's conclusion that the allegedly coerced confession was not "used" to obtain the conviction in the Miggins case, within the meaning of the TIRC Act. The State argues that the statement could not have been "used" to obtain the conviction, since it was "never used as evidence at trial." We disagree.

¶ 108    The stated purpose of the TIRC Act is to establish an "extraordinary procedure to investigate and determine factual *claims of torture*." (Emphasis added.) *Id.* § 10. The TIRC Act defines a " '[c]laim of torture' " to mean

"a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into confessing to the crime for which the person was convicted *and the tortured confession was used to obtain the conviction* and for which there is some credible evidence related to allegations of torture occurring within a county of more than 3,000,000 inhabitants." (Emphasis added.) *Id.* § 5(1).

Thus, a confession must have been "used to obtain the conviction" in order to support a claim for relief under the TIRC Act.

¶ 109    In finding that the TIRC had jurisdiction to review Johnson's claim with respect to the Miggins case, the TIRC's disposition explained its view that the phrase " '[u]sed to obtain the conviction' is a broader term than 'introduced into evidence.' " *Johnson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.091-J, at 18. The TIRC noted that, in an unrelated prior disposition, *In re Claim of Anderson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.014-

A (2015), https://tirc.illinois.gov/content/dam/soi/en/web/tirc/documents/decisions/ May%202015%20Anderson%20Order.1.0.pdf [https://perma.cc/U5TZ-YR6V] (*Tony Anderson*), the TIRC "found that an express statement [by prosecutors] that a confession would be used for impeachment would deter a defendant from testifying at trial, and that the deterrence would be of significant benefit to the prosecution." *Johnson*, Ill. Torture Inquiry & Relief Comm'n Cl. No. 2011.091-J, at 18. Insofar as Johnson did not testify in the Miggins case in order to avoid impeachment with his confession, the TIRC found that Johnson's claim fell within TIRC's jurisdiction. *Id.*

¶ 110     In the order granting the State's motion to dismiss, the trial court did not afford any deference to the TIRC's conclusion on this point, despite its apparent recognition that the statutory language at issue was ambiguous. The court acknowledged that "scenarios could be envisioned where it is an open question as to whether unadmitted statements could be deemed to have been 'used to obtain the conviction,' " but the trial court found that "this case is not one of them" since Johnson had sought to use his statement at trial to cross-examine State witnesses.

¶ 111     We thus address whether an allegedly coerced statement that was not introduced at trial may be "used to obtain the conviction" within the meaning of the TIRC Act. 775 ILCS 40/5(1) (West 2018). In doing so, we are again guided by our decision in *Mitchell*, 2016 IL App (1st) 141109, which also involved interpretation of the TIRC Act.

¶ 112     The meaning of the TIRC Act's phrase "used to obtain the conviction" (775 ILCS 40/5(1) (West 2018)) is a question of statutory interpretation, subject to *de novo* review. *Mitchell*, 2016 IL App (1st) 141109, ¶ 24. The same principles of statutory interpretation recited in *Mitchell*

apply here. Our primary objective "is to ascertain and give effect to legislative intent." (Internal quotation marks omitted.) *Id.* The most reliable indicator of that intent is the statutory language, "given its plain and ordinary meaning." (Internal quotation marks omitted.) *Id.* " 'When the statutory language is clear and unambiguous, we must apply it as written, without resort to extrinsic aids of statutory construction.' " *Id.* "However, when statutory language is ambiguous and susceptible to more than one interpretation, both of which are reasonable, it is appropriate to resort to other aids of construction to determine legislative intent. [Citations.]" *Id.*; see also *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 426 (2002) ("A statute is ambiguous if it is susceptible to two equally reasonable and conflicting interpretations. [Citation.]"). "Where a statute's language is ambiguous, we may look to other sources to ascertain the legislature's intent." *Mitchell*, 2016 IL App (1st) 141109, ¶ 27.

¶ 113      "[C]ourts will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute." *Id.*; *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 656 (2005) ("if the legislature has charged an agency with administering and enforcing a statute, we 'will give substantial weight and deference' to the agency's resolution of any ambiguities in that statute." (quoting *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)). "[W]hile an agency's interpretation of a statute is not binding on this court [citation], we must give substantial weight and deference to statutory interpretations made by an administrative agency charged with administration of a particular statute." (Internal quotation marks omitted.) *Mitchell*, 2016 IL App (1st) 141109, ¶ 27.

¶ 114    Here, the phrase "used to obtain the conviction" within the TIRC Act's definition of a "claim of torture" is ambiguous, as it is susceptible to multiple reasonable interpretations. Under the narrower reading of the phrase urged by the State, a confession is "used to obtain the conviction" only if the State affirmatively introduces it into evidence. That is a reasonable interpretation, but it is not the only reasonable reading of that phrase. Under the broader view urged by Johnson, a coerced confession is "used to obtain the conviction," regardless of whether it was introduced at trial, if it influenced a defendant's decision not to testify in his own defense. This broader interpretation is also reasonable.

¶ 115    Since the phrase "used to obtain the conviction" is ambiguous, the TIRC's interpretation of that phrase is entitled to "substantial weight and deference." See *id.* As the TIRC noted in its disposition of Johnson's claims, it has previously applied the broader interpretation of the phrase "used to obtain the conviction," supporting Johnson's position. Specifically, in its 2015 *Tony Anderson* decision, the TIRC stated:

> "Looking at the plain language of the statute, the Commission believes that a convicted person has claimed he was 'tortured into confessing to the crime for which the person was convicted and the tortured confession was used to obtain the conviction' when:
>
>> a person has been found guilty of a crime, either by a verdict or a guilty plea;

the person has made an incriminating statement (or

been said to have made an incriminating statement) relating

to that crime; and

the tortured confession was a significant element that

led to the verdict or plea.

The last element is a question that must be resolved on the facts of

each case." *Tony Anderson*, Ill. Torture Inquiry & Relief Comm'n

Cl. No. 2011.014-A, at 12-13.

Elsewhere in the *Tony Anderson* decision, the TIRC stated:

"The Commission believes that the phrase 'the tortured

confession was used to obtain the conviction' must turn on the

facts of each case. In any particular case, the tortured confession

must have been *used*, that is, it must have had some role in,

obtaining the conviction." (Emphasis in original.) *Id.* at 13.

¶ 116    Under the facts of the *Tony Anderson* decision, the TIRC found that the allegedly tortured

confession was "used to obtain the conviction" where it deterred petitioner from testifying at

trial. *Id.* at 13-14. The TIRC reasoned:

"[T]he State's Attorney advised Anderson's lawyer and the Judge

that Anderson had made an oral statement (which was apparently a

confession), and that it would be introduced if Anderson took the

witness stand. The Commission believes that an express statement

that a confession would be used for impeachment would deter a

defendant from testifying at trial, and that the deterrence would be of significant benefit to the prosecution. The Commission therefore finds that this case falls within the language 'used to obtain the conviction.' " *Id.*

¶ 117 The TIRC has thus adopted a broad reading of whether a confession is "used to obtain the conviction" within the meaning of the TIRC Act. According to the TIRC, a confession is used to obtain a conviction if it is "a significant element that led to the verdict" or "had some role" in obtaining the conviction. *Id.* at 13. As illustrated by the *Tony Anderson* decision and its disposition of Johnson's claims, the TIRC does not believe that a confession need to have been introduced at trial to be considered "used to obtain the conviction." Rather, it is sufficient if the confession deterred the petitioner from testifying in his own defense.

¶ 118 The TIRC's interpretation of the "used to obtain the conviction" phrase is entitled to "substantial weight and deference." See *Mitchell*, 2016 IL App (1st) 141109, ¶ 27. Applying that deference, we now conclude that Johnson's claim with respect to the Miggins case came within the TIRC Act's definition of a claim of torture. The circuit court's decision was erroneous in this respect.

¶ 119 The Miggins Case TIRC Claim Was Not Barred by Judicial Estoppel

¶ 120 This conclusion, however, does not end our analysis with respect to the dismissal of the TIRC claim arising from the Miggins case. Apart from its ruling that the confession was not "used to obtain the conviction," the circuit court independently found that the TIRC claim for that case should be dismissed because Johnson asserted inconsistent positions with respect to the confession. Specifically, the court suggested that, since Johnson had sought to use the

confession to cross-examine State witnesses at trial (and had again raised this issue in his direct appeal in the Miggins case), he could not now complain that the same confession deterred him from testifying in his defense.

¶ 121    This portion of the circuit court's decision appears to have been referencing the doctrine of judicial estoppel, which is an "equitable doctrine invoked by the court at its discretion. [Citations.]" *Seymour v. Collins*, 2015 IL 118432, ¶ 36. "Judicial estoppel applies in a judicial proceeding when litigants take a position, benefit from that position, and then seek to take a contrary position in a later proceeding. [Citation.]" *Id.* Our supreme court has identified "five prerequisites as 'generally required' before a court may invoke the doctrine of judicial estoppel." *Id.* ¶ 37. "The party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. [Citations.]" *Id.*

¶ 122    In this case, the requirements for judicial estoppel are not satisfied. Even if the first four prerequisites were met, it is clear that the fifth is not. That is, Johnson has not "succeeded" in a prior proceeding or received any "benefit" from the allegedly inconsistent position. At the trial of the Miggins case, his request to use his statement to cross-examine the State's witnesses was denied, and his argument on that point was rejected on direct appeal. For that reason, we disagree with the trial court's suggestion that Johnson's position at his trial precluded his TIRC Act claim with respect to the Miggins case.

¶ 123    We conclude that (1) the allegedly coerced confession in the Miggins case was "used to obtain the conviction" within the meaning of the TIRC Act (775 ILCS 40/5(1) (West 2018))

and (2) Johnson's TIRC claim regarding the Miggins case was not estopped by a prior inconsistent position. Thus, the circuit court erred in granting the State's motion to dismiss the TIRC's referral with respect to the Miggins case.

¶ 124                          Denial of the Motion to Substitute Judge as of Right

¶ 125         We have now explained why, on the merits, the circuit court's order granting the State's motion to dismiss the TIRC Act referral was erroneous with respect to both the Miles case and the Miggins case. However, as discussed below, we also conclude that the prior denial of Johnson's motion for substitution of judge was erroneous. That is, the matter should have been transferred to a different judge before consideration of the State's motion to dismiss.

¶ 126         Johnson sought substitution of judge as of right pursuant to section 2-1001(a)(2) of the Code. 735 ILCS 5/2-1001(a)(2) (West 2018). Under that provision:

"A substitution of judge in any civil action may be had in the following situations:

***

(2) Substitution as of right. When a party timely exercises his or her right to a substitution without cause as provided in this paragraph (2).

(i) Each party shall be entitled to one substitution of judge without cause as a matter of right.

(ii) An application for substitution of judge as of right shall be made by motion and shall be granted if it is presented before trial or hearing begins and before the judge

- 45 -

to whom it is presented has ruled on any substantial issue in

the case, or if it is presented by consent of the parties." *Id.*

¶ 127    "When properly made, a motion for substitution of judge as of right is absolute; the trial

court has no discretion to deny it." *Palos Community Hospital v. Humana Insurance Co.*, 2021

IL 126008, ¶ 25 (citing *Bowman v. Ottney*, 2015 IL 119000, ¶ 17). "[T]he provisions of section

2-1001 are to be liberally construed to promote rather than defeat the right of substitution."

*Bowman*, 2015 IL 119000, ¶ 17.

¶ 128    If a such a motion is denied in error, then all subsequent orders are void and should be

vacated. See *Palos Community Hospital*, 2021 IL 126008, ¶ 34; *Shachter v. City of Chicago*,

2011 IL App (1st) 103582, ¶ 22 ("where a petition for substitution of judge is erroneously

denied, all orders entered subsequent to the denial are null and void" (Internal quotation marks

omitted.))

¶ 129    The trial court denied Johnson's motion upon finding that section 2-1001(a)(2) of the Code

was inapplicable to a circuit court proceeding upon a TIRC referral. On appeal, Johnson

maintains that section 2-1001(a)(2) applies and that his motion was timely. In response, the

State contends that Johnson "waived" the issue because his counsel "acquiesced" in

assignment of the matter to Judge Joyce. The State otherwise argues that section 2-1001(a)(2)

does not apply to circuit court review of a TIRC disposition and, even if it did, Johnson's

substitution motion was untimely. For the following reasons, we conclude that section 2-

1001(a)(2) does apply and that Johnson's motion for substitution as of right was timely. Thus,

the trial court erred in denying the motion.

¶ 130                                    Waiver

¶ 131    We briefly address the State's waiver argument, which consists of a single paragraph stating that Johnson's counsel "was present before Judge Martin in April of 2018 when [Johnson's] TIRC disposition was assigned to Judge Timothy Joyce for further proceedings."[11] According to the State, Johnson's counsel "acquiesced in the referral to Judge Timothy Joyce," and Johnson "thereby waived any right to seek substitution by participating in the appointment and subsequent negotiations."

¶ 132    The State does not cite to any case law suggesting that a party may waive its ability to move for substitution of judge as of right pursuant to section 2-1001(a)(2) of the Code. Further, our supreme court has clarified that, so long as a party files such a motion before the "certain, specified occurrences" in the statute, the party is " 'entitled to one substitution of judge without cause as a matter of right.' " *Palos Community Hospital*, 2021 IL 126008, ¶ 28. In any event, "while an appellant who fails to raise an issue in the trial court waives that issue [citation], the rule of waiver is a limitation on the parties and not the courts." (Internal quotation marks omitted.) *Asian Human Services Family Health Center, Inc. v. Asian Human Services, Inc.*, 2020 IL App (1st) 191049, ¶ 15. We do not find that Johnson waived his ability to challenge the denial of his substitution motion under section 2-1001(a)(2) of the Code. We thus turn to the merits of the parties' arguments regarding application of that provision.

¶ 133    Whether Section 2-1001(a)(2) Applies Upon Judicial Review of a TIRC Disposition

¶ 134    The parties dispute whether section 2-1001(a)(2) of the Code applies in the context of circuit court review of a TIRC disposition. As the trial court noted, there does not appear to be any precedent from this court or our supreme court on this precise question.

---

[11]The State does not provide a corresponding record citation for this assertion.

¶ 135        Johnson urges that judicial review of a TIRC referral is a civil proceeding, so that "the civil rules for substitution of judge apply." The State maintains that a circuit court proceeding upon a TIRC referral is equivalent to a proceeding under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)), so that we must follow precedent finding there is no right to substitution of judge in such postconviction proceedings. As discussed below, the relevant statutes and our case law make clear that judicial review of a TIRC referral is a "civil action," implicating section 2-1001(a)(2) of the Code. 735 ILCS 5/2-1001(a)(2) (West 2018).

¶ 136        Whether section 2-1001(a)(2) applies in this context is a matter of statutory construction, implicating *de novo* review. *Palos Community Hospital*, 2021 IL 126008, ¶ 24. "A court's primary objective when construing a statute is to ascertain and give effect to the legislature's intent." *Id.* "The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. [Citation.] When the language is clear and unambiguous, we must give effect to the statute as written without resort to further aids of statutory construction. [Citation.]" *Id.*

¶ 137        Section 2-1001(a) states that it applies "in any civil action" but does not define that term. 735 ILCS 5/2-1001(a) (West 2018). Whether judicial review of a TIRC disposition is a "civil action" for purposes of section 2-1001(a) is apparently an issue of first impression.

¶ 138        Both parties discuss *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85, in which this court stated: "Judicial review of a TIRC disposition *is a civil proceeding*, 'akin to' the third stage of a postconviction proceeding, *which is also civil in nature*." (Emphases added.) Johnson cites *Gibson* to support the proposition that judicial review of a TIRC proceeding is a "civil action" for purposes of section 2-1001(a) of the Code (735 ILCS 5/2-1001(a) (West 2018)). However,

*Gibson* did not discuss whether any rule of civil procedure applied to judicial review of a TIRC decision but instead concerned whether an adverse inference could be drawn against police officers who invoked the fifth amendment. *Gibson*, 2018 IL App (1st) 162177, ¶ 108 (holding that it was error for the court not to draw an adverse inference).

¶ 139     The State concedes that *Gibson* characterized review of a TIRC decision as a "civil proceeding" but argues that we should focus on that opinion's subsequent statement that "the legislature intended post-[TIRC] judicial review to be understood as a new species of postconviction proceeding." *Id.* ¶ 135. The State argues that "a defendant in a post-conviction proceeding does not have an absolute right to seek a substitution of judge," citing three cases involving proceedings under the Post-Conviction Hearing Act or section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2018)). See *People v. Hall*, 157 Ill. 2d 324, 331 (1993) (affirming denial of recusal motion in proceeding under the Post-Conviction Hearing Act and holding "[t]here is no absolute right to a substitution of judge at a post-conviction proceeding"); *People v. Harvey*, 379 Ill. App. 3d 518, 519 (2008) (affirming dismissal of a petition under section 2-1401 of the Code, which in turn was premised on a claim that prior dismissal of petition under the Post-Conviction Hearing Act was void "because the court did not properly dispose of his contemporaneous motion for substitution of judge"); *People v. Crenshaw*, 2017 IL App (4th) 150170, ¶ 22 (holding that the right to substitution of judge under section 2-1001(a)(2) does not apply in a section 2-1401(f) proceeding attacking a conviction as void). However, none of the State's cited cases concern judicial review following a TIRC disposition, and thus they do not resolve the question before us.

¶ 140        We recognize that the TIRC Act indicates that judicial review of a TIRC decision is a type of postconviction proceeding. See 775 ILCS 40/50 (West 2018) ("*Notwithstanding the status of any other postconviction proceedings* relating to the petitioner, if the court finds in favor of the petitioner, it shall enter an appropriate order ***." (Emphasis added.)); *id.* § 55(b) ("A claim of torture asserted through the Commission shall not adversely affect the convicted person's rights to *other postconviction relief.*" (Emphasis added.)). Nevertheless, section 2-1001(a) expressly states that it applies in "*any civil action.*" (Emphasis added.) 735 ILCS 5/2-1001(a) (West 2018). Although *Gibson* stated that "[j]udicial review of a TIRC disposition is a civil proceeding" (*Gibson*, 2018 IL App (1st) 162177, ¶ 85), that case does not answer whether such a review proceeding is a "civil action" within the meaning of section 2-1001(a) (735 ILCS 5/2-1001(a) (West 2018)).

¶ 141        As there is no precedent directly on point, we look to the relevant statutes to determine whether judicial review of a TIRC decision is a "civil action" implicating the right to move for substitution of judge under section 2-1001(a)(2) of the Code. We believe that it is. Specifically, the TIRC Act indicates that judicial review of a TIRC decision is equivalent to an administrative proceeding under article III of the Code. And the provisions of article II of the Code, which includes section 2-1001(a)(2), apply to article III proceedings absent express language to the contrary.

¶ 142        The TIRC Act makes clear that the TIRC functions as an administrative agency whose findings are subject to judicial review. The TIRC Act "establishes an extraordinary procedure to investigate and determine factual claims of torture" (775 ILCS 40/10 (West 2018)) and

establishes the TIRC as an "independent commission under the Illinois Human Rights Commission for administrative purposes." *Id.* § 15(a).

¶ 143    After hearing evidence, if a majority of the TIRC members conclude "that there is sufficient evidence of torture to merit judicial review, the case shall be referred" to the circuit court. *Id.* § 45(c) Significantly, section 55(a) of the TIRC Act explicitly incorporates the Administrative Review Law as applicable to judicial review of a TIRC decision. *Id.* § 55(a) ("Unless otherwise authorized by this Act, the decisions of the Commission are final and are *subject to review as final decisions under the provisions of the Administrative Review Law*, and shall only be overturned if the court finds that they are against the manifest weight of the evidence." (Emphasis added.)).

¶ 144    The Administrative Review Law is set forth in article III of the Code. 735 ILCS 5/3-102 (West 2018). Section 3-102 of the Code provides, in part:

> "This Article III shall apply to and govern every action to review judicially a final decision of any administrative agency *where the Act creating or conferring power on such agency, by express reference, adopts the provisions of this Article III* or its predecessor, the Administrative Review Act. This Article shall be known as the 'Administrative Review Law.' " *Id.*

As noted, the TIRC Act expressly references the Administrative Review Law as governing judicial review of a TIRC decision. 775 ILCS 40/55(a) (West 2018). In turn, by operation of section 3-102, the Administrative Review Law (article III of the Code) "shall apply to and govern every action to review judicially a final decision" by the TIRC. 735 ILCS 5/3-102

(West 2018). In other words, the judicial review of a TIRC decision is equivalent to an article III administrative review proceeding.

¶ 145    The question then becomes whether section 2-1001's substitution of judge provisions apply to an article III administrative review proceeding. We recognize that section 2-1001 is part of article II of the Code, whereas the Administrative Review Law is set forth in article III. However, the Code makes clear that article II's provisions apply to article III proceedings, in the absence of statutory language to the contrary. Specifically, section 1-108 of the Code states:

> "(a) *The provisions of Article II of this Act apply to all proceedings covered by Articles III* through XIX of this Act except as otherwise provided in each of the Articles III through XIX, respectively.
>
> (b) In proceedings in which the procedure is regulated by statutes other than those contained in this Act, such other statutes control to the extent to which they regulate procedure *but Article II of this Act applies to matters of procedure not regulated by such other statutes*.
>
> (c) As to all matters not regulated by statute or rule of court, the practice at common law prevails." (Emphases added.) *Id.* § 1-108.

¶ 146    Section 1-108(a) indicates that the procedural rules of article II—which includes the substitution of judge provision in section 2-1001—apply to an article III administrative review proceeding, absent any specific contrary language. *Id.* § 1-108(a). Since article III is silent regarding the right to a substitution of judge, section 2-1001 applies in an article III proceeding.

As discussed, the TIRC Act expressly incorporates article III in describing judicial review of a TIRC disposition. 775 ILCS 40/55(a) (West 2018).

¶ 147    Moreover, even if the TIRC Act made no reference to article III, we would still find section 2-1001 applicable to judicial review of a TIRC disposition, pursuant to section 1-108(b) of the Code. Section 1-108(b) states that, in proceedings governed by statutes outside the Code, "such other statutes control to the extent to which they regulate procedure *but Article II of this Act applies to matters of procedure not regulated by such other statutes*." (Emphasis added.) 735 ILCS 5/1-108(b) (West 2018). Thus, even if the TIRC Act did not expressly reference the Administrative Review Law (775 ILCS 40/55(a) (West 2018)), section 1-108(b) would otherwise control, such that article II would "appl[y] to matters of procedure not regulated by" the TIRC Act. 735 ILCS 5/1-108(b) (West 2018). As the TIRC Act does not state whether a party may seek a substitution of judge, by default section 1-108(b) would call for application of section 2-1001 in circuit court proceedings upon referral of a TIRC disposition. Based on the above statutory provisions, we conclude that section 2-1001(a)(2) applies to judicial review of a TIRC determination.

¶ 148    Although the foregoing statutory language leads us to conclude that a claimant may seek substitution of judge as of right during circuit court review of a TIRC disposition, we note that this conclusion is entirely consistent with the regulation providing that, upon a TIRC referral to the circuit court, the chair of the TIRC "shall recommend that the case be assigned to a judge other than the judge who tried the criminal case and other than the judge who presided over any previous post-conviction proceedings." 20 Ill. Adm. Code 2000.50(b) (2017). The preference for a new judge is not surprising since, as illustrated by the record in this case, a

judge who previously ruled against the claimant in other postconviction proceedings may be tempted to dismiss the TIRC claims without adequately reviewing the TIRC's findings. We also agree with Johnson that review of torture claims by a judge "with fresh eyes" is also consistent with the stated purpose of the TIRC Act to provide an "extraordinary procedure to investigate and determine factual claims of torture." 775 ILCS 40/10 (West 2018). In short, we agree that the letter and spirit of the TIRC Act are best served by review of a TIRC referral before a judge who was not previously involved in the claimant's trial or prior postconviction proceedings.

¶ 149    We further recognize that, notwithstanding our conclusion that a motion for substitution under section 2-1001(a)(2) may be considered in this context, the circuit court's denial of Johnson's substitution motion would nonetheless be correct if the motion was otherwise untimely. Thus, we turn to address that issue.

¶ 150                    Johnson's Substitution Motion Was Timely

¶ 151    In arguing that the motion to substitute judge was untimely, the State primarily asserts the circuit court had already made "substantial rulings" in the TIRC review proceeding before Johnson filed his motion in October 2019. The State otherwise argues that the motion should be deemed untimely because Johnson "had an opportunity to 'test the waters' and form an opinion" regarding the judge's reaction to his claims before he filed the motion. The State points out that Johnson did not object to Judge Joyce presiding over the proceedings from April 2018 to October 2019. The State suggests that Johnson's motion amounted to "forum-shopping" after negotiations between the parties failed and the State served its motion to

dismiss. For the following reasons, we reject the State's arguments and conclude that the motion for substitution was timely.

¶ 152    Section 2-1001(a)(2)(ii) of the Code specifies that a substitution motion "shall be granted if it is presented before trial or hearing begins *and before the judge to whom it is presented has ruled on any substantial issue in the case*, or if it is presented by consent of the parties." (Emphasis added.) 735 ILCS 5/2-1001(a)(2)(ii) (West 2018); see also *Palos Community Hospital*, 2021 IL 126008, ¶ 25 ("When a party timely exercises his or her right to a substitution without cause ***—for instance, when the motion is filed before trial begins and *before the judge has ruled on any substantial issue*—the party 'shall be entitled to one substitution of judge without cause as a matter of right.' " (Emphasis added.) (quoting 735 ILCS 5/2-1001(a)(2)(i) (West 2016)).

¶ 153    " 'A ruling is substantial if it relates directly to the merits of the case.' " *Williams v. Leonard*, 2017 IL App (1st) 172045, ¶ 11 (quoting *Petalino v. Williams*, 2016 IL App (1st) 151861, ¶ 18). Our court has sometimes used the word "substantive" instead of "substantial" when describing the rulings that render a substitution motion untimely. See, *e.g.*, *Safeway Insurance Co. v. Ebijimi*, 2018 IL App (1st) 170862, ¶ 35 (affirming denial of substitution motion "on the basis that the trial judge made a substantive ruling" before the motion was filed). "Whether there was a ruling on a substantial issue in the case presents a question of law, to which a *de novo* standard of review applies." *In re Marriage of Petersen*, 319 Ill. App. 3d 325, 338 (2001).

¶ 154    Some, but not all, discovery rulings may be deemed substantial for purposes of assessing the timeliness of a substitution motion. This court has held that a " 'trial court's ruling on a

discovery motion is a ruling on a substantial issue when it pertains to evidentiary trial matters.' " *Ebijimi*, 2018 IL App (1st) 170862, ¶ 33 (quoting *City of Granite City v. House of Prayers, Inc.*, 333 Ill. App. 3d 452, 461 (2002)). For example, in *Ebijimi*, this court affirmed denial of a motion to substitute judge where the trial court had previously "granted the [defendants] leave to depose a former employee of [plaintiff], denied their motion to compel written discovery and for broader depositions, and ordered them to come forward with evidence that [plaintiff] disputed or denied coverage." *Id.* ¶ 35. We explained that "[t]hese kinds of discovery rulings are substantive because they decide what is relevant to the case." *Id.* (citing *Petersen*, 319 Ill. App. 3d at 338-39 (holding motion to substitute was untimely because prior rulings on motions to quash "were not merely preliminary, administrative or preparatory for trial, but went to the admissibility and relevance of material information")). On the other hand, a prior ruling is not "substantial" if it did "not go to any question of evidence to be admitted or indicate any inclination of the judge toward the merits or disposition of the case" and did not "implicate[ ] the rights of the parties at trial." *Nasrallah v. Davilla*, 326 Ill. App. 3d 1036, 1040 (2001) (a prior ruling setting the evidence deposition fee was not substantial).

¶ 155     In this case, the record does not support the State's contention that the trial court made "substantial" rulings before Johnson filed his substitution motion. The State's brief urges that the "circuit court made rulings governing allowable discovery, including recently denying [Johnson's] request to take depositions." As support, the State's brief cites three pages from the transcript of the September 2019 hearing at which the trial court indicated its hesitation to decide whether to schedule depositions before it considered a potential motion to dismiss. However, the cited portions of the hearing transcript simply do not reflect an actual ruling

denying depositions. The trial court indicated that it was premature to decide the need for depositions at that point, but it did not rule that Johnson was not entitled to them.

¶ 156　　At oral argument, this court gave the State's counsel an opportunity to explain why it believed the cited portion of the hearing transcript constituted a "substantial" ruling, but counsel could not do so. During argument, this court directed the State to file a submission to explain or correct its brief's citation on this point. The State has filed a supplemental brief in which it represents that its prior citations of the September 2019 hearing were "accurate" but "inadvertently incomplete." The State now contends that it meant to include citations of additional portions from the September 2019 hearing, as well as citations of earlier proceedings on April 11 and May 29, 2019. The State's supplemental brief suggests (for the first time) that the trial court's "substantive discovery rulings" included not only the "denial of depositions" in September 2019 but also the trial court's preceding "authorization of subpoenas for the complete police file for Johnson, authorization of ordering transcripts, [and] denial of issuing interrogatories to nonparties."

¶ 157　　This court has reviewed the hearing transcripts relied on by the State, but we are not convinced that they reflect any ruling on a "substantial issue in the case" within the meaning of section 2-1001(a)(2). First, the State does not cite any statement by the trial court reflecting a definitive ruling as to whether Johnson could take any depositions. Indeed, while the transcript shows that counsel and the court discussed the possibility of depositions, the record does not contain any *motion* by Johnson seeking depositions. As discussed, the transcript of the September 13, 2019, hearing shows that the trial court signaled that it would not yet decide

whether Johnson was entitled to depositions because it thought depositions could be a "waste of time" if the State filed a motion to dismiss.[12]

¶ 158    We are also not persuaded by the State's new citations of the April 11 and May 29 hearings, as they also do not reflect any definitive or "substantial" discovery ruling. The hearing transcripts reflect that (1) the court agreed that Johnson was entitled to obtain certain documents from the State (which the State never disputed) and (2) the court disallowed Johnson from serving interrogatories "at this time" but explicitly stated that it was open to revisiting that issue after the State's production of documents. Specifically, at the May 2019 hearing, the trial court told Johnson's counsel that it was willing to reconsider the issue of interrogatories at a later time: "If you want to come back and convince me that I am wrong after you get these probably voluminous documents *** I will give you that opportunity. But I don't want to give you false hopes so I am going to say, no, right now."

¶ 159    As the court had *not* definitively decided the scope of prehearing discovery or decided what would be admissible at a potential evidentiary hearing, we do not find there was any prior

---

[12]We separately note that it was highly improper for the trial court, in its remarks at the September 2019 hearing, to *sua sponte* invite the State to file a motion to dismiss one or both of Johnson's TIRC claims. Although the court stated that it did not have "any preconceptions" about Johnson's TIRC claims, it specifically commented that, with respect to the Miggins case, "the statement that was purportedly compelled from Mr. Johnson wasn't used in his case." The court's comment effectively informed the State that it would be receptive to an argument that the confession was not used to obtain his conviction within the meaning of the TIRC Act. The court elsewhere suggested that the State should file a motion to dismiss because it suspected it could "resolve" some or all of Johnson's claims without need for further discovery or an evidentiary hearing: "if there are going to be motions that *** keep it from going to an evidentiary hearing, I'd want to hear those, too." The court further indicated its willingness to consider a motion to dismiss to avoid discovery becoming a "waste of time." In this manner, the trial court came dangerously close to improperly "assum[ing] the role of an advocate" for the State, rather than retaining its "role as neutral arbiter." See *People v. Evans*, 2017 IL App (1st) 150091, ¶¶ 25-26. Although this concern is independent of our conclusion that Johnson was entitled to substitution of judge as of right under section 2-1001(a)(2)(ii) of the Code, it further justifies remand before a different trial judge.

" 'substantial' " ruling " 'pertain[ing] to evidentiary trial matters.' " *Ebijimi*, 2018 IL App (1st) 170862, ¶ 33. Our determination is consistent with the judge's own remarks at the hearing on the substitution motion. At that time, the court acknowledged that the parties had "broached some discovery issues" that were "in the nature of case management" but nevertheless stated: "I don't think I made a substantive ruling in the case." As discussed, the record supports that conclusion.

¶ 160        In sum, the record reflects no discovery ruling that " 'relate[d] directly to the merits of the case.' " *Williams*, 2017 IL App (1st) 172045, ¶ 11. That is, there was no prior ruling on a "substantial issue" that rendered Johnson's substitution motion untimely under section 2-1001(a)(2)(ii) (735 ILCS 5/2-1001(a)(2)(ii) (West 2018)).

¶ 161        Finally, we reject the State's argument that the substitution motion was properly denied because Johnson had an opportunity to "test the waters" and form an opinion as to Judge Joyce's disposition to the matter. Our supreme court has unequivocally held that "the test the waters doctrine is incompatible with the plain language of section 2-1001(a)(2)." *Palos Community Hospital*, 2021 IL 126008, ¶ 28. That decision explains:

> "As the statutory text makes clear, so long as a party files its substitution motion before certain, specified occurrences, the party is 'entitled to one substitution of judge without cause as a matter of right.' 735 ILCS 5/2-1001(a)(2)(i) (West 2016). In part, the statute provides that a motion for substitution of judge as of right shall be granted if the motion is presented both before the trial or hearing begins and before the judge to whom the motion is presented has

ruled on any substantial issue in the case. [Citation.] A party having
'been able to form an opinion as to the court's disposition toward
his or her case' is not among the criteria listed in the statute. Thus,
the test the waters doctrine is an improper basis on which to deny a
motion for substitution of judge as of right." *Id.*

Here, Johnson's substitution motion was filed before any evidentiary hearing, and before the trial ruled on any substantial issue in the case. Thus, the motion was timely under the explicit language of section 2-1001(a)(2). In light of *Palos Community Hospital*, there is simply no merit or relevance to the State's contention that the motion was untimely because Johnson had an opportunity to form an opinion as to Judge Joyce's disposition to his claims.

¶ 162      For the foregoing reasons, we agree with defendant that (1) the TIRC review proceeding was a "civil action" in which he could move for substitution as of right under section 2-1001(a)(2) and (2) his motion was timely. Accordingly, the trial court erred in denying the motion for substitution of judge as of right. That order is reversed, and Johnson is entitled to further proceedings before a different judge.

¶ 163      As the denial of Johnson's substitution motion was erroneous, the subsequent order granting the State's motion to dismiss is void and must be vacated. See *id.* ¶ 34 (concluding that every trial court order entered after the filing of the erroneously denied substitution motion "must be vacated"); *Shachter*, 2011 IL App (1st) 103582, ¶ 22 ("where a petition for substitution of judge is erroneously denied, all orders entered subsequent to the denial are null and void" (Internal quotation marks omitted.)); see also *Chavis v. Woodworker's Shop, Inc.*, 2018 IL App (3d) 170729, ¶ 15 ("Any order entered subsequent to the time that a motion for

substitution of judge should have been granted becomes a nullity" (citing *In re Dominique F.*, 145 Ill. 2d 311, 324 (1991)).

¶ 164                                III. CONCLUSION

¶ 165        Accordingly, we reverse the denial of Johnson's motion to substitute judge as a matter of right and vacate the order granting the State's motion to dismiss. We remand for the circuit court to assign the matter to a new judge to conduct further proceedings consistent with the TIRC Act and this opinion. Those proceedings shall include an evidentiary hearing with respect to Johnson's claims of torture relating to the allegedly tortured confessions in the Miles and Miggins cases.

¶ 166        Reversed in part and vacated in part.

¶ 167        Cause remanded with directions.

---

**No. 1-20-1371**

---

| | |
|---|---|
| **Cite as:** | *People v. Johnson*, 2022 IL App (1st) 201371 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 91-CR-22152, 91-CR-22460; the Hon. Timothy J. Joyce, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Leonid Feller, of Quinn Emanuel Urquhart & Sullivan LLP, and Matthew C. Darch, Jesse L. Reising, and Eric Wessan, of Kirkland & Ellis LLP, both of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Myles P. O'Rourke, Special State's Attorney, of O'Rourke & Moody, of Chicago (Andrew N. Levine, Ariel Hodges, and Elizabeth Gavin, Assistant Special State's Attorneys, of counsel), for the People. |

---